## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

KAIJIA MALANA TRAYNHAM,    )
        Plaintiff       )
                          )
            v.           )    C.A. No. 11-cv-30246-MAP
                          )
MICHAEL J. ASTRUE,      )
Commissioner, Social     )
Security Administration,  )
        Defendant      )

## MEMORANDUM AND ORDER REGARDING
## PLAINTIFF'S MOTION FOR ORDER REVERSING DECISION OF
## COMMISSIONER AND DEFENDANT'S MOTION FOR ORDER AFFIRMING
## DECISION OF COMMISSIONER
### (Dkt. Nos. 8 & 16)

### February 25, 2013

PONSOR, U.S.D.J.

## I. INTRODUCTION

This action seeks review of a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's applications for Social Security disability insurance benefits. Plaintiff applied for a period of disability, disability insurance benefits, and supplemental security income on May 24, 2007, and May 4, 2009,

respectively,[1] alleging disability for chronic pain, back
disorders, and affective disorders.  (A.R. 188-97, 199-205.)
After a hearing on May 3, 2011, the Administrative Law Judge
("ALJ") found that Plaintiff was not disabled and denied
Plaintiff's claim.  (A.R. 45-60.)  The Appeals Council
denied the Plaintiff's request for review on September 13,
2011, rendering the hearing decision final and subject to
judicial review. (A.R. 1-4.)  Plaintiff filed this complaint
on November 7, 2011.

Plaintiff now moves for an order reversing the decision
of the Commissioner (Dkt. No. 8), and Defendant moves for an
order affirming the decision of the Commissioner (Dkt. No.
16).  For the reasons stated below, Plaintiff's motion will
be allowed, and Defendant's motion will be denied.

## II. FACTS

At the time of the ALJ's decision, Plaintiff was forty-
five years old.  She had completed tenth grade, obtained a

---

[1] Her claims were assigned a protective filing date of
May 17, 2007.  (A.R. 45, 241.)  A protective filing date is
provided under certain circumstances when an applicant makes
an oral or written enquiry about applying for disability
benefits prior to submitting an application.  20 C.F.R. §§
416.340-416.350.

general equivalency degree, and completed job training
leading to a Certified Nurse's Aide certificate.  She had
previously worked as a dialysis assistant, patient care
technician, and certified nurse's aide. (A.R. 13-15, 250.)

A.   Physical Conditions.

Plaintiff testified that her back pain began after she
was involved in a motor vehicle accident in 1999.  (A.R. 30,
51.)  Plaintiff underwent a left posterior C5-C6 minimally-
invasive microdisectomy in March 2003 to treat cervical disc
disease. (A.R. 376, 465.)

Late in the night of March 3, 2004, Plaintiff was
accosted by an assailant who stole her purse and punched her
in the face and head.  The next morning, she went to
emergency room at Baystate Medical Center.  (A.R. 376-78.)
She reported severe generalized headache, double and blurry
vision, severe photophobia in the right eye, diffuse facial
pain, some tingling in her left hand, and diffuse neck pain
with a radiation of pain into the left upper extremity,
consistent with symptoms from the previous year that had
required surgery.  (A.R. 376.)  The physicians diagnosed
multiple facial contusions, neck strain, and radiculopathy

3

of the upper left extremity.  (A.R. 377.)  A computed tomography ("CT") scan of the brain revealed a moderate amount of brain atrophy for Plaintiff's age.  (A.R. 377, 380.)  A CT scan of the facial bones revealed a right medial orbital wall fracture and right-sided nasal bone fracture. (A.R. 377, 381.)  The consulting ophthalmologist stated that Plaintiff probably had traumatic iritis.  (A.R. 377.)

Plaintiff was treated in 2005 and 2006 for complaints of chest pain, bilateral shoulder and arm pain, and recurring low back pain.  (A.R. 346-47, 349-50, 356-58, 360-62.)  She was diagnosed with a viral upper respiratory tract infection (A.R. 356-57), sciatica and elevated blood pressure (A.R. 347, 349), and cervical radiculopathy due to degenerative changes (A.R. 353-54).

On August 27, 2008, Plaintiff was seen at the Caring Health Center for complaints of neck pain radiating into her left arm.  Examination revealed limited neck movement with tingling of her left arm and numbness in her fingers.  (A.R. 399.)  Magnetic resonance imaging ("MRI") of the cervical spine on September 5, 2008, revealed multilevel degenerative disc changes as well as a reversal of the cervical

lordosis.[2]

In February 2009, she was evaluated by Dr. Christopher Comey at New England Neurosurgical Associates, LLC, due to increasing left-sided neck and arm pain as well as diffuse weakness in the left arm.  (A.R. 465-66.)  Imaging revealed an acute left C5-C6 disc herniation.  The physical examination by Dr. Comey revealed mild diffuse weakness in the left upper extremity.  Her examination was limited due to pain.  (A.R. 52, 465.)

On April 22, 2009, Plaintiff returned for another evaluation by Dr. Comey.  Dr. Comey reviewed the CT scan of the cervical spine that was done in March 2009.  He noted severe degenerative changes with reversal of her cervical lordosis at C4-C5, C5-C6, and C6-C7.  Again, this examination was limited due to Plaintiff's pain.  Dr. Comey recommended that, if the pain was severe and incapacitating, Plaintiff should undergo an anterior diskectomy and fusion. (A.R. 464.)  Plaintiff did not want to consider surgery for

---

[2] Cervical lordosis: the normal, anteriorly convex curvature of the cervical segment of the vertebral column; cervical lordosis is a secondary curvature of the vertebral column, acquired postnatally as the infant lifts its head. Stedman's Medical Dictionary (27th ed. 2000).

fear that she would not be able to move her neck again.
(A.R. 464, 467, 470, 523.)  For that reason, Dr. Comey
recommended that Plaintiff be evaluated for a trial of
injection therapy.  (A.R. 464.)

Plaintiff was treated by two primary care physicians in
2009 and 2010 for her chronic pain.  At Baystate Health, Dr.
Abdulrahman Alkabbani, M.D., treated Plaintiff for chronic
pain three times in 2009 and 2010.  Plaintiff also went to
the emergency room at Baystate Health in November 2009
complaining of low back pain.

In October 2010, Dr. Martin Bem became Plaintiff's
primary care physician.  Dr. Bem referred Plaintiff to two
specialists: Dr. Raghu Bajwa, M.D. and Dr. Douglas Molin,
M.D. at Pioneer Spine and Sports Physicians PC.  (A.R. 554-
55.)  Dr. Bajwa evaluated Plaintiff for neck pain that
radiated into her left arm and lower back pain.  Dr. Bajwa
noted that Plaintiff was in "mild distress," her left
shoulder motion was limited, and her shoulder was positive
for tenderness.  Dr. Bajwa recommended physical therapy.
Dr. Molin evaluated claimant based on her complaints of pain
in her neck, lower back, left arm, and left leg.  (A.R.

6

558.)  Dr. Molin noted that Plaintiff's left arm was "so painful I could not move it."  Dr. Molin diagnosed Plaintiff with postlaminectomy syndrome cervical region, chronic pain syndrome, tobacco disorder, and pain in limb.  (A.R. 559-60.)

Dr. Bem also treated Plaintiff three times between October 2010 and January 2011 for her neck and back pain.  (A.R. 567-76.)  Dr. Bem noted that Plaintiff had multiple medical problems: anxiety, depression, insomnia, chronic low back pain, chronic neck pain syndrome, high blood pressure, hypertension, chronic pain syndrome, smoker, and sciatica.  (A.R. 575.)

In December 2010, Plaintiff presented to the emergency room at Mercy Medical Center with complaints of back pain, rated ten out of ten on a pain scale.  (A.R. 542.)  Her exam was positive for back pain and the physician noted that she was tearful and in pain.  (A.R. 548-49.)  Plaintiff was diagnosed with acute lumbar spasm.  (A.R. 550.)

B.    Mental Conditions.

Plaintiff also suffered from well-documented depression.  On August 18, 2008, she presented at Liberty

7

Street Counseling Services and underwent an initial psychological evaluation. (A.R. 382-96.) Plaintiff reported that she was self-medicating with alcohol and had panic attacks when she tried to sleep. (A.R. 382-83.) The interviewing clinician, David Hamilton, reported that, while Plaintiff was cooperative, she was also disheveled, tense, depressed, sad, and restless. He also noted that her thought process was unremarkable, her speech was appropriate, and her intellectual functioning was average. However, she displayed a short attention span and impaired recent and remote memory. (A.R. 387-89.) She was diagnosed with major depressive disorder, recurrent; alcohol abuse; and panic disorder without agoraphobia. (A.R. 391-392.) The clinician assigned a Global Assessment of Functioning ("GAF") score of 45.[3] (A.R. 392.)

Plaintiff attended ten treatment sessions at Liberty Street Counseling Services but was discharged when she ended

_____

[3] The GAF scale provides a means for measuring psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. A score between 41 and 50 denotes serious symptoms or serious impairment in social, occupational, or school functioning. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (2002).

services without notice.  (A.R. 462.)  Plaintiff was never
given a GAF score above 45 while attending treatment.  (A.R.
462-63.)  Plaintiff testified that she ended treatment
because it was not helping her condition.  (A.R. 19, 483.)

C.   State Agency Opinions: Physical Capacity.

On October 16, 2008, Dr. Leslie Caraceni, M.D., a non-
examining medical consultant for the Massachusetts
Disability Determination Services ("DDS"), assessed
Plaintiff's physical residual functional capacity based
solely on her medical records.  (A.R. 404-11.)  Dr. Caraceni
found that Plaintiff could stand or walk for about six hours
in an eight-hour workday, and sit for about six hours in an
eight-hour workday.  (A.R. 405.)  Dr. Caraceni noted that
Plaintiff had limited reaching ability due to neck pain but
should have unlimited handling, fingering, and feeling
ability.  (A.R. 407.)  According to Dr. Caraceni's report,
Plaintiff's symptoms were attributable to a medically
determinable impairment, the severity and duration of her
symptoms as reported by Plaintiff were credible, and her
symptoms's effect on function was consistent with the
medical and non-medical evidence.  (A.R. 409.)  On October

9

6, 2009, Dr. Elaine Hom, M.D., another DDS medical consultant, affirmed Dr. Caraceni's findings. (A.R. 482.)

On April 5, 2010, Dr. Abdulrahman Alkabbani, M.D., Plaintiff's primary care treating physician, completed a Department of Transitional Assistance and Disability Evaluation Services Form. (A.R. 525-530.) Dr. Alkabbani diagnosed Plaintiff with chronic back pain and cervical disc herniation, the treatment for both consisting of physical therapy and pain medication. (A.R. 528.) He stated that Plaintiff had an impairment affecting her ability to work, which was expected to last more than a year. (A.R. 530.)

On February 3, 2011, Dr. Martin Bem, Plaintiff's successor primary care treating physician, completed a Physical Residual Functional Capacity Questionnaire. (A.R. 579-83.) Dr. Bem reported that Plaintiff suffered from anxiousness, dizziness, pain in her neck radiating into both shoulders, and pain in her back radiating into her legs. He noted that Plaintiff's medications made her drowsy and less attentive. (A.R. 579.) Dr. Bem opined that Plaintiff's impairments were expected to last more than twelve months and that the symptoms were severe enough to constantly

10

interfere with the level of attention and concentration she
would need to perform simple work tasks.  (A.R. 579-80.)
Dr. Bem noted that Plaintiff would be unable to sit for 10
minutes or stand for 15 minutes at a time; and, in an eight-
hour day, Plaintiff could sit or stand for less than two
hours. (A.R. 580-81.)  He noted several times on the form
that Plaintiff was unable to work.  (A.R. 581.)

D.   State Agency Opinions: Mental Health.

     On December 3, 2008, Dr. Robert Dean, Ph.D., a DDS
mental health consultant, completed a consultative
examination on Plaintiff.  Dr. Dean examined Plaintiff's
intellectual ability and performed an in-person
psychodiagnostic interview.  (A.R. 413-18.)  Dr. Dean
reported that Plaintiff was slow moving "as if she were
elderly or somewhat physically compromised, but otherwise .
. . , without any apparent sign of physical disability or
impairment."  (A.R. 413.)  Dr. Dean found that, while
Plaintiff's thought processes were logical, coherent,
relevant, and without any bizarre or peculiar content, she
seemed to be of low-average intellectual ability.  (A.R.
413.)  Plaintiff's scores on an intelligence test indicated

11

that she was in the "borderline intellectual functioning
category." Dr. Dean opined that the test scores might
underestimate of her abilities, but that her chronic and
generalized depression contributed to a lack of effort in
testing. (A.R. 414.) Dr. Dean also noted that Plaintiff's
arithmetic calculation skills were an area of significant
weakness. (A.R. 415.) Dr. Dean found that Plaintiff would
not be able to manage her funds at that time as she was
abusing alcohol. (A.R. 417.) Dr. Dean diagnosed Plaintiff
with alcohol dependence, continuous; cocaine
abuse/dependence, remission; depressive disorder; and risk
of mathematics disorder. (A.R. 418.)

On January 17, 2009, Dr. Brian O'Sullivan, Ph.D., a
non-examining consultative mental health specialist for DDS,
reviewed Plaintiff's mental functional capacities based
solely on her medical records. (A.R. 419-36.) Dr.
O'Sullivan found that Plaintiff was limited in her ability
to understand and remember detailed instructions, to carry
out detailed instructions, to maintain attention and
concentration for extended periods, and to perform
activities within a schedule. (A.R. 419.) He found that

Plaintiff was not limited in other respects, such as understanding and memory, concentration and persistence, maintaining social interaction, and having the ability to adapt.  (A.R. 419-20.)  He noted that Plaintiff could "keep average pace for simple routine directions over a regular full time routine but variable energy and concentration due to depression and [substance abuse disorder] could slow detailed tasks and might limit punctuality for early morning shift starts."  (A.R. 421.)

On October 27, 2009, Dr. Robert Sampson, M.D., examined Plaintiff for the sole purpose of Social Security Evaluation.  (A.R. 483-88.)  Dr. Sampson reported that Plaintiff was of low average intelligence and had difficulty with subtraction problems but that she was oriented and could abstract similarities well.  Dr. Sampson noted that her depression was related to the chronic neck and left arm pain that Plaintiff experienced.  (A.R. 486.)  He recommended treatment for her depression in conjunction with a pain treatment program.  (A.R. 487.)  Plaintiff was given a GAF score of 52.

On August 13, 2010, Dr. Victor Carbone, Ph.D., a state

13

agency mental health consultant, examined Plaintiff.  (A.R. 531-533.)  He concluded that she was of average intelligence but appeared to be in pain, had depressed mood, and somewhat delayed speech. (A.R. 532-533.)  He concluded that Plaintiff was a "[p]atient with history of significant pain and a history of severe abuse who continues to struggle and is not currently in treatment." (A.R. 533.)  She was assigned a GAF score of 54.  (A.R. 533.)

E.    Plaintiff's Testimony.

In the hearing before the ALJ, Plaintiff testified that she was unable to work due to pain.  (A.R. 15.)  She reported pain in her left arm that went to her fingers and included numbness and tingling and in her lower back that went down her right leg and included muscle spasms.  (A.R. 15-16, 30.)  She stated that her concentration was limited, and her prescribed medicines made her dizzy and drowsy. (A.R. 20-26.)  She stated that she could not stand for an extended period, could not sit for more than twenty minutes at a time, and could not walk for any distance.  (A.R. 21-22, 28.)  She said that she was unable to do anything on a consistent schedule because she experienced chronic pain on

a regular basis.  She also testified that she felt
constantly fatigued due to depression, had memory problems,
and was easily confused.  (A.R. 30-32.)

F.  <u>ALJ's Findings</u>.

At Step One of the disability adjudicative process, the
ALJ found that Plaintiff had engaged in substantial gainful
activity between December 2006 through December 2007.  The
ALJ found that Plaintiff failed to meet her burden of proof
to overcome that the presumption that the work qualified as
substantial gainful activity, and therefore Plaintiff's
earnings between the onset date and December 31, 2007
disqualified her for benefits during that period.  However,
the ALJ found that there had been a continuous twelve-month
period where Plaintiff did not engage in substantial gainful
activity since December 31, 2007, when she might qualify for
benefits.

At Step Two, the ALJ found that Plaintiff's
degenerative disc disease to the cervical spine, left upper
extremity radiculopathy, chronic back pain, depressive
disorder, and polysubstance abuse disorder were severe
impairments.  (A.R. 47-48.)  At Step Three, the ALJ

15

determined that Plaintiff's impairments did not meet or medically equal any listed impairments.  (A.R. 49.)  The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except:

> she would be limited to simple and unskilled tasks.  The claimant's work should not be performed at heights or with ropes, ladders, or scaffolding.  The claimant's work should not entail overhead reaching and lifting. The claimant would be limited to no more than occasional climbing ramps or stairs, stooping, crouching, crawling, or kneeling.  She would be limited to no more than occasional grasping, pinching, and twisting with her non-dominant left hand and arm. The claimant's work should be outside (sic) and have no more than incidental exposure to the cold and vibrations.  The claimant's work should not involve the operation of right foot or leg controls.  The claimant's work should entail lifting no more than five pounds with her left hand and arm.

(A.R. 50.)  Based on this RFC, at Step Four, the ALJ determined that Plaintiff was not capable of performing any past relevant work.  (A.R. 58.)  However, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  (A.R. 59.) The ALJ concluded that Plaintiff was not disabled.  (A.R. 60.)

### III.  DISCUSSION

16

Plaintiff argues that the ALJ's RFC assessment was not supported by substantial evidence for the following reasons: (1) the ALJ did not properly apply the so-called "Avery Factors," relating to the assessment of subjectively-reported symptoms such as pain; (2) the ALJ failed to properly weigh medical opinions, especially those from Plaintiff's treating primary care physicians; and (3) the ALJ improperly analyzed and relied upon the Vocational Expert's testimony.

A review of the record confirms that the ALJ did not properly apply the <u>Avery</u> Factors, did not give proper weight to Plaintiff's treating and consultative physicians, and did not properly analyze the opinion of the vocational expert. The case will be remanded to the ALJ for reconsideration consistent with this decision.

A.    <u>Standard of Review</u>.

Judicial review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision and (2) whether the Commissioner applied the correct legal standards. <u>Seavey v. Barnhart</u>, 276 F.3d 1, 9 (1st Cir. 2001). The responsibility for

weighing conflicting evidence and resolving issues of credibility belongs to the Commissioner and his designee, the ALJ.  See id. at 10.  The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Accordingly, the court must affirm the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). The court's obligation to affirm a substantially supported finding holds true "even if the record arguably could justify a different conclusion."  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

B.   Avery Factors.

     Plaintiff first argues that the ALJ erred by not properly applying the Avery factors to her subjective complaints about her pain and limitations.  The ALJ found

18

that Plaintiff was not "entirely credible" as to her
limitations due to inconsistent reports of her pain and a
lack of correlation between her allegations and the medical
evidence.  (A.R. 58.)

Under <u>Avery v. Sec'y of Health and Human Servs.</u>, 797
F.2d. 19, 23 (1st Cir. 1986), an ALJ should consider the
following factors in assessing a claimant's asserted
subjective symptoms such as pain:

1.   The individual's daily activities;

2.   The location, duration, frequency, and intensity
     of the individual's pain or other symptoms;

3.   Factors that precipitate and aggravate the
     symptoms;

4.   The type, dosage, effectiveness, and side effects
     of any medication;

5.   Treatment, other than medication, the individual
     receives or has received for relief of pain or
     other symptoms;

6.   Any measures other than treatment the individual
     uses or has used to relieve pain or other symptoms
     (<u>e.g.</u> lying flat on his or her back, standing for

15 to 20 minutes every hour, or sleeping on a

board); and

7.   Any other factors concerning the individual's

functional limitations and restrictions due to

pain or other symptoms.

Not every factor must be considered.   NLRB v. Beverly

Enters-Mass. Inc., 174 F.3d 13, 26 (1st Cir. 1999).   Rather,

the ALJ's explanation for finding a claimant less than fully

credible need only be "sufficiently specific to make clear

to the individual and to any subsequent reviewers the weight

the adjudicator gave to the individual's statements and the

reason for that weight." SSR 96-7p; Foley v. Astrue, No. 09-

10864, 2010 WL 2507773 at *7 (D. Mass. Jun. 17, 2010).

As evidence of Plaintiff's ability to function with her

pain, the ALJ relied on three main factors: (1) her daily

living and social activities; (2) her sporadic treatment and

decision not to have surgery; and (3) inconsistencies in the

medical record as to the severity of Plaintiff's pain.   A

review of the record demonstrates that the ALJ's assessment

of these factors was not adequately supported by the

evidence.

First, the ALJ noted that Plaintiff was capable of preparing meals, washing dishes, shopping, managing her finances, and interacting with other people either on the phone or in person. (A.R. 51.) However, Plaintiff had actually reported severe limitations in her abilities to manage daily living. Plaintiff reported that she could only prepare simple meals and did so only once or twice a week. (A.R. 265-66.) The only household chore that she could perform, approximately two times per week, was washing the dishes. (A.R. 266.) She reported that she shopped for food once per month. (A.R. 267.) Both Plaintiff and her sister reported that the sister assisted Plaintiff with the shopping, dressing, and cleaning. (A.R. 20-21, 31, 288, 306, 532-33.) While Plaintiff frequently talked to her sister, she also testified that two to four days a week she was unable to get out of bed due to pain, and even on her good days, she needed to lie down two times for over an hour because of pain. (A.R. 25, 29-30, 264, 277, 485.)

Second, the ALJ found that Plaintiff lacked credibility because she refused to undergo recommended surgery which "suggests her symptoms are not severe or incapacitating."

21

(A.R. 58.)  While Plaintiff did refuse a second surgery
recommended by Dr. Comey, Plaintiff consistently expressed
concern that the surgery would result in a loss of mobility
in her neck.  (A.R. 464, 467, 470, 523.)  Plaintiff's fear
stemmed in large part from the fact that her previous
surgery had been unsuccessful and made her symptoms worse.
Plaintiff was evaluated for Dr. Comey's alternative
treatment, trial injections.  (A.R. 558-60.)

     The ALJ also noted that the majority of Plaintiff's
treatments for her physical impairments occurred in 2009
with only intermittent treatment prior to or after 2009. The
ALJ found that the limited treatment "suggests that the
symptoms may not have been as serious as has been alleged."
(A.R. 58.)  It is true that most of the medical records come
from 2008 or later.  However, the ALJ also assigned
Plaintiff an onset date of December 31, 2007, because she
had substantial gainful activity before that point in time.
Since December 31, 2007, Plaintiff has been regularly
receiving treatment for her physical impairments through
emergency room visits and examinations by her primary care
providers and consultants at Baystate High Street Health

Center, Comprehensive Family Medical Care, Physical Medicine
and Rehabilitation, and Pioneer Spine and Sports Physicians.
(See Dkt. No. 6-1, List of Exhibits.)

Finally, the ALJ found that Plaintiff's "extreme
symptoms of pain and limitations that she reports" were not
supported by the "objective findings." (A.R. 58.) The ALJ
noted that several doctors had reported that during
evaluations, Plaintiff "appeared to be in no distress,
cooperative, and alert and had a normal gait." (A.R. 58
(internal citation omitted).) Significantly, the parts of
the record that the ALJ cited were observations that were
not part of the actual examinations but observations simply
noted on the chart. Moreover, the ALJ failed to address how
Plaintiff's depression or medication affected her demeanor.
In his intelligence capacity assessment, Dr. Dean noted that
"her apparently chronic and generalized depression probably
contributed to a lack of energetic, persistent effort in
testing." (A.R. 414.) Plaintiff also testified that her
medication made her drowsy all of the time and dizzy. (A.R.
20.) These side effects were confirmed in Dr. Bem's
assessment in the Physical Residual Functional Capacity

23

Questionnaire.  He noted that her medications "will make her drowsy, less attentive."  (A.R. 579.)

In fact, Plaintiff's medical records demonstrated that the doctors who examined her gave credence to her pain. During examinations, her doctors reported that her neck and shoulder movements were limited by pain and that she could not stand straight.  (A.R. 399, 470-71, 512, 522.)  On one occasion, the chart noted that her general appearance was that she was in "lots of pain," "in tears."  (A.R. 522.) Plaintiff's two examinations with Dr. Comey were also limited due to her pain.  (A.R. 464-66.)  When Dr. Raghu Bajwa, M.D., saw Plaintiff in December 2010, he reported "mild distress," a limited range of motion in her left shoulder, and tenderness in her paraspinal muscles and left shoulder.  (A.R. 556-57.)  Finally in December 2010, Dr. Molin reported that while Plaintiff was responsive and cooperative she did not move her left upper extremity because of pain and that her sensation in that side was diminished.  He also noted that "her left arm was so painful that I would not move it."  (A.R. 558-60.)

The reasons that the ALJ gives for discounting

Plaintiff's credibility and her subjective assessment of pain are not supported on the record.  A more detailed examination of the records reveal additional support for Plaintiff's limitations and pain assessments.

C.   <u>Weight of the Medical Evidence</u>.

Plaintiff argues that the ALJ erred by placing greater weight on non-treating sources than on treating sources. Reports from non-examining physicians that "contain little more than brief conclusory statements or the mere checking of boxes . . . are entitled to relatively little weight." <u>Berrios-Lopez v. Sec'y of Health and Human Servs.</u>, 951 F.2d 427, 431 (1st Cir. 1991).

The ALJ is generally required to give more weight to the opinions of treating physicians than to other medical opinions.  20 C.F.R. § 494.1527(d)(2).  The ALJ should give controlling weight to treating physicians' opinions if the opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence" in the record.  <u>Id.</u>

The ALJ assigned "significant weight" to the opinion of

25

Dr. Dean and "great weight" to the opinions of Dr. Caraceni
and Dr. Hom -- all non-treating physicians.  However, the
ALJ assigned "only some weight" to Dr. Carbone and Dr.
Sampson, DDS examining physicians.  Plaintiff has had two
primary care physician, Dr. Alkabbani and Dr. Bem, who were
treating physicians.  The ALJ assigned "some weight" to Dr.
Alkabbani's assessment and "little weight" to Dr. Bem's
assessment.  Finally, the ALJ assigned "little weight" to
David Hamilton's psychological evaluation of Plaintiff.
(A.R. 56-57.)

Four of the assessments could be classified as coming
from treating sources: Dr. Comey, who performed Plaintiff's
back surgery; Dr. Alkabbani; Dr. Bem; and David Hamilton,
the clinician who performed the initial psychological
evaluation and subsequent therapy.  The opinions of treating
physicians, if supported, are generally entitled to
controlling weight.  The remaining physicians only completed
consultative evaluations.  Their opinions, while not
entitled to controlling weight, must nevertheless be taken
into consideration in evaluating disability and given the
weight that is appropriate in light of other evidence in the

record.

Plaintiff's treating physicians described the severity
of Plaintiff's left neck and arm symptoms, her mental health
condition, and her ability to work since 2008.  Dr. Comey
evaluated Plaintiff twice and recommended surgery for her
"severe left neck and arm symptoms." (A.R. 464)  Plaintiff's
examinations with Dr. Comey were limited by her pain but the
review of her CT scan revealed "severe degenerative
changes." (A.R. 465.)  Dr. Comey, like most of the
physicians who have evaluated Plaintiff, found her pleasant
but he also noted that she was "tearful." (A.R. 465.)

Plaintiff's primary care physicians provided a
compelling, and clinically supported, account of her
limitations and conditions.  While many of the agency
evaluators considered either Plaintiff's physical or mental
limitations, Drs. Alkabbani and Bem were responsible for all
facets of her care and both noted her depression, anxiety,
and chronic pain.  The combination of Plaintiff's
limitations undoubtedly contributed to their explicit
finding that she was unable to work.

Dr. Alkabbani had treated Plaintiff at Baystate Medical

Center (A.R. 470-72, 521-22; 523-24) and had completed the
requested form.  The ALJ assigned "some weight" to Dr.
Alkabbani's opinion but noted that the assessment did not
define the "functional limitations that claimant would
have." (A.R. 54.)  However, the state form that Dr.
Alkabbani was asked to fill out never requested information
on functional limitations.  Dr. Alkabbani reported
Plaintiff's diagnosis of chronic back pain and cervical disc
herniation.  Dr. Alkabbani also opined that Plaintiff's
physical impairment affected her ability to work and that
impairment would last for more than a year.  In routine
assessments of Plaintiff, Dr. Alkabbani had diagnosed
Plaintiff with chronic back pain and noted that when she was
in the office Plaintiff appeared to be in pain, was limited
in movement, and was unable even to stand straight. (A.R.
470-71, 522.)  While Dr. Alkabbani did note that on one
visit that Plaintiff "did not look in pain or distress"
(A.R. 524), this finding was consistent with Plaintiff's
testimony that she had good and bad days.

     Dr. Bem provided the most detailed evaluation of
Plaintiff's limitations on the Physical Residual Functional

28

Capacity Questionnaire.  On the form, Dr. Bem opined that
Plaintiff would be absent more than four days a month and
would have drastic limitations on her ability to carry out
even basic tasks at work.  Despite Dr. Bem's familiarity
with Plaintiff, the ALJ gave his report "little weight"
because: (1) it was inconsistent with the records; and (2)
Dr. Bem had only been treating Plaintiff for four months at
the time of the evaluation.  Neither of these criticisms
holds water.

First, Dr. Bem saw Plaintiff as much as any other
physician.  Dr. Alkabbani -- who the ALJ assigned "some
weight" to -- saw Plaintiff three times in 2009.  Dr. Bem
also saw Plaintiff three times -- in October 2010, December
2010, and January 2011.  Dr. Bem was involved in finding a
solution to Plaintiff's pain problems.  In December 2010,
Dr. Bem referred her to a sports medicine specialist and
psychiatrist (A.R. 554-55, 556-57, 558-59) and prescribed
pain medication.  Dr. Bem had the opinions of these
specialists as well as personal evaluations when he
completed the Physical Residual Functional Capacity
Questionnaire.

Dr. Bem's assessment also finds support throughout the record. As noted previously, each of Plaintiff's treating physicians noted the severity of her condition and the limitations placed on her due to those conditions. The testimony of Plaintiff and her sister also confirmed the reports of bad days as well as the need for frequent breaks. Rather than "little weight," the opinion of Dr. Bem should have been given the full weight generally afforded a treating physician.

Finally, there was also evidence that Plaintiff had mental limitations that seriously impaired her functioning. The ALJ gave "little weight" to the opinion of treating source David Hamilton at Liberty Street Counseling because: (1) the GAF score came from an initial visit; and (2) Plaintiff received limited treatment before discontinuing with Dr. Hamilton. This termination of treatment, the ALJ found, was evidence that the symptoms were not disabling. (A.R. 55.)

In fact, a GAF score was assigned to Plaintiff at each of her ten therapy visits. At eight sessions, Plaintiff was assigned a GAF score of 45. At the other two sessions, she

30

was assigned a GAF score of 44.  While Plaintiff did receive
two GAF scores in the low 50s from evaluating, non-treating
sources, she was consistently given a GAF score in the 40s
by her treating source who saw her ten times over six
months.  The GAF score indicates that Plaintiff suffered
serious impairment to her functioning.[4]

The ALJ also erred in drawing inferences from
Plaintiff's decision to stop attending therapy.  While
Plaintiff did stop attending therapy, there is no indication
in the record that she stopped attending because the
symptoms were not disabling.  Rather, as Plaintiff told
other evaluators, she stopped attending because she did not
find therapy helpful and her condition was not improving.
(A.R. 483.)  In the records from Liberty Street Counseling,
Mr. Hamilton also noted a lack of progress in part due to
alcohol dependence and transportation obstacles.  (A.R.
463.)  In sum, the record clearly indicates that Plaintiff's
mental impairments were serious.

As the ALJ noted, there were some notes on the record

---

[4] Even the scores given by the evaluative sources
indicated at least moderate impairment to Plaintiff's
functioning.

that suggested that Plaintiff's chronic pain and depression did not impose sufficiently severe limitations to render her disabled.  Plaintiff and her sister testified that Plaintiff could do some household tasks and make trips out several days a week.  Plaintiff seemed to get some relief from Percocet.  Plaintiff also seemed to fear or abandon some of the treatments recommended by her physicians and therapists.

However, Plaintiff's back surgery, her long history of chronic back and shoulder pain, her mental disabilities, and the fact that all four of Plaintiff's treating physicians noted the severity of her condition and the limitations that it imposed, constituted overwhelming evidence of disability. A fair review of this record reveals that, in light of this strong evidence, there simply was no "substantial" evidence supporting the ALJ's decision.  The ALJ failed to give proper consideration and weight to the opinions of Dr. Comey, Dr. Alkabbani, Dr. Bem, and Liberty Street Counseling regarding Plaintiff's limitations.  The reasons offered by the ALJ to brush aside these opinions simply cannot survive objective scrutiny.  In light of this, the court will remand the case to a different ALJ for further consideration.

D.   <u>Testimony of Vocational Expert</u>.

Finally, Plaintiff also argues that the ALJ improperly relied on the vocational expert's testimony.  To rely on the opinion of a vocational expert, "the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." <u>Arocho v. Sec'y of Health and Human Servs.</u>, 670 F.2d 374, 375 (1982).  "The Secretary may meet her burden of proving the existence of a substantial number of suitable jobs in the economy by relying upon an expert's answer to a hypothetical question, so long as the hypothetical itself corresponds to conclusions that are supported by substantial evidence in the record."  <u>Mendez v. Sec'y of Health and Human Servs.</u>, 48 F.3d 1211 (Table) at *2 (1st Cir. 1995).

At the hearing, the ALJ asked the vocational expert if Plaintiff would be able to do light work with manipulative limitations.  The vocational expert responded that there would not be many jobs with those limitations except a booth cashier, information clerk in a mall or public building, and a ticket seller in a movie theater or public transportation facility.

33

The ALJ then asked the vocational expert which of those jobs could be performed if Plaintiff's chronic pain and depression incapacitated her for one-third of the day. The vocational expert opined that Plaintiff would not be able to perform <u>any</u> work that existed in the national or local economy under those conditions.

The ALJ relied on the vocational expert's opinion on a hypothetical that only included manipulative limitations. Clearly, the second hypothetical, which provided for incapacitation due to chronic pain and depression, was the appropriate analytical rubric. All of Plaintiff's treating physicians noted that Plaintiff not only suffered from manipulative limitations but also incapacitation due to pain and depression. Additionally, the evaluation by Dr. Caraceni, a medical consultant for DDS, supported the second hypothetical. In her assessment, Plaintiff could only work for two-thirds of a work day due to neck pain. (A.R. 405.) She also felt that Plaintiff's symptoms were credible. (A.R. 407.) This opinion was confirmed by Dr. Hom. (A.R. 482.) There were no physicians who opined that Plaintiff could work a full day, even at light work with manipulative

limitations.

The substantial evidence of the record demonstrated
that an appropriate hypothetical should have focused on
light work with manipulative limitations <u>and</u> incapacitation
for at least one-third of a work day.  When given that
hypothetical, the vocational expert testified that there
were no jobs in the local or national economy that an
individual with those constraints could take.  The ALJ erred
in relying on a hypothetical unsupported by the record and
failing to give proper weight to the opinion of the
vocational expert when posed with the more appropriate
hypothetical.

E.   <u>Remedy</u>.

The record before the court provides strong evidence
supporting an outright reversal of the Commissioner's
determination.  The court recognizes, however, that reversal
is justified only in "unusual" cases where "the proof of
disability is overwhelming" or "the proof is very strong and
there is no contrary evidence."  <u>Seavey v. Barnhart</u>, 276
F.3d 1, 11 (1st Cir. 2001).  Except in glaring cases, the
better practice is for the court to remand the case for

further proceedings to permit the Commissioner to resolve the factual issues and make an entitlement determination. Id.; Freeman v. Barnhart, 274 F.3d 606, 609 (1st Cir. 2001) ("A remand is the proper remedy here because it would allow the Commissioner to fulfill his role of resolving conflicting evidence, a task which is not [the court's] to perform.").

Prudence suggests that this record, though powerful, may not present the compelling circumstances where outright reversal and a direct order awarding benefits is proper.   In light of First Circuit authority and erring on the side of caution, the court will order the case remanded, with a condition.

Plaintiff has been waiting a very long time for a proper resolution of her claim.   She first filed her application in May 2007, almost six years ago.   With this in mind, the court will order the Assistant United States Attorney to report to the court every ninety days on the status of Plaintiff's application until the matter is resolved.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion To Reverse the Decision of the Commissioner (Dkt. No. 8) is hereby ALLOWED, and Defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. No. 16) is hereby DENIED.  The case is hereby remanded to the Commissioner for further proceedings consistent with this decision.  The Commissioner is ordered to report to the court, through counsel, no later than May 27, 2013, as to the status of proceedings on remand, and every ninety days thereafter until this matter is fully resolved.

It is So Ordered.

<u>Michael A. Ponsor</u>
MICHAEL A. PONSOR
U.S. District Judge

37